IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DAVID VELASQUEZ,

    Petitioner,                          No. CIV S-05-2118 LKK CHS P

    vs.

TOM L. CAREY, et al.,

    Respondents.          FINDINGS AND RECOMMENDATIONS

_____/

I.  INTRODUCTION

Petitioner David Velasquez is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. §2254.  He is currently serving a sentence of 15 years to life following a 1982 conviction for second degree murder in the Los Angeles County Superior Court.  Petitioner does not challenge the propriety of his conviction; rather, he challenges the Governor's reversal of the 2003 decision of the Board of Parole Hearings ("Board") finding him suitable for parole.  As set forth below, it is recommended that relief be granted on the claim.  The Governor's reversal of the Board's decision finding petitioner suitable for parole was not supported by some evidence in the record, in violation of his due process rights, and the state court decision determining otherwise constitutes an unreasonable application of clearly established federal law.

1

## II.  BACKGROUND

Petitioner's offense was described in the probation officer's report prior to sentencing as follows:

> On November 13, 1981, the defendant became involved in an altercation at the residence of Linda Benjamin. There have been various accounts as to the cause of the altercation between the defendant and the victim Pam Martinelli. The account that most witnesses seem to agree upon is that the deceased victim indicated that she was going to inform on the defendant. It appears she was leaving when co-defendant Allen Ochoa stopped her outside and began striking her with his fists. It appears that the defendant then approached her with an ice pick that he kept in his van and began stabbing her. She was stabbed 16 times in the chest with wounds puncturing her heart, aorta, and lungs. Her throat was also slashed three times. Her body was then dumped in a trash bin in Culver City. It was discovered there the following morning. Witnesses who were present at the time the altercation broke out and who later heard this defendant and co-defendant say they had killed her, informed the police and investigation led to the arrest of the defendant and co-defendant approximately one month later.

(Exhibit C at 5-6.[1])

Petitioner was sentenced to a prison term of 15 years to life; his minimum eligible parole date passed on February 26, 1990. (Exhibit B at 1.) On September 23, 2003, the Board of Parole Hearings conducted a hearing and determined that petitioner was suitable for parole. The Board cited petitioner's stable social history, positive prison programming, vocational accomplishments, and the fact that he had remained discipline free in prison for over 20 years. (Exhibit B at 55-56, 61.) The Board noted that, although his life crime was horrendous, it was committed as a result of significant stress while under the influence of PCP, alcohol, and depressants or barbiturates. (*Id*. at 56.) It also found that petitioner lacked a significant history of violent crime, characterizing his prior criminal record as insignificant. (*Id*. at 56, 60.) Finally, the Board found that petitioner showed remorse, indicated that he understood the nature and magnitude of the offense, and showed a desire to change toward good citizenship. (*Id*. at 56.)

---

[1] All citations to exhibits refer to the exhibits attached to respondent's answer, filed 12/15/06.

2

...

On February 20, 2004, Governor Schwarzenegger invoked his authority to reverse the Board's grant of parole. Petitioner sought habeas corpus relief in the Los Angeles County Superior Court. In a brief reasoned decision, the superior court concluded that some evidence supported the governor's reversal.[2] (Exhibit F.) Petitioner subsequently filed petitions in the California Court of Appeal and California Supreme Court; both were summarily denied. (Exhibits H & J.)

### III.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)). This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999). Under AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001). This court will look to the last reasoned state court decision in determining whether the law

---

[2] The superior court found that some of the Governor's reasons for reversing the Board's decision were unsupported by the record, but then concluded that "since current law only requires that the Governor's finding be supported by 'some evidence' (*In re Rosenkrantz*, 29 Cal.4th 616, 667), that modicum is present in the instant case."

applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), *cert. dismissed*, 538 U.S. 919 (2003).

## IV.  DISCUSSION

### A.  Due Process and Parole

The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives a person of life, liberty, or property without due process of law. A person alleging a due process violation must first demonstrate that he or she was deprived of a protected liberty or property interest, and then show that the procedures attendant upon the deprivation were not constitutionally sufficient. *Kentucky Dep't. of Corrections v. Thompson*, 490 U.S. 454, 459-60 (1989); *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002).

A protected liberty interest may arise from either the Due Process Clause or from state laws. *Board of Pardons v. Allen*, 482 U.S. 369, 373 (1987). The United States Constitution does not, in and of itself, create a protected liberty interest in a parole date. *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981). However, where a state's statutory scheme uses mandatory language, it "'creates a presumption that parole release will be granted' when or unless certain designated findings are made, and thereby gives rise to a constitutional liberty interest." *McQuillion*, 306 F.3d at 901 (*quoting Greenholtz v. Inmates of Nebraska Penal*, 442 U.S. 1, 12 (1979)).

The Ninth Circuit has conclusively determined that California state prisoners who have been sentenced to prison with the possibility of parole have a clearly established, constitutionally protected liberty interest in receipt of a parole release date." *Irons v. Carey*, 505 F.3d 846, 850-51 (9th Cir. 2007) (*citing Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006); *Biggs v. Terhune*, 334 F.3d 910, 914 (9th Cir. 2003); *McQuillion*, 306 F.3d at 903; and *Allen*, 482 U.S. at 377-78 (*quoting Greenholtz*, 442 U.S. at 12)). Thus, the issue for consideration is whether petitioner was afforded adequate procedural protections before being

4

deprived of his parole release date.

B. "Some Evidence" Standard

The full panoply of rights afforded a defendant in a criminal proceeding is not constitutionally mandated in the context of a parole proceeding. *See Pedro v. Or. Parole Bd.*, 825 F.2d 1396, 1398-99 (9th Cir. 1987). The Supreme Court has held that a parole board's procedures are constitutionally adequate if the inmate is given an opportunity to be heard and a decision informing him of the reasons he did not qualify for parole. *Greenholtz*, 442 U.S. at 16. In addition, the Ninth Circuit has made clear that, as a matter of clearly established law, "some evidence" must support a parole decision. *Sass*, 461 F.3d at 1128-29; *McQuillion*, 306 F.3d at 904.

Petitioner does not contest that he received notice of his 2003 parole hearing, an opportunity to appear, and copies of the decisions rendered by the Board and Governor. Thus the only remaining question is whether there was some evidence to support the Governor's reversal.

Under the some evidence standard, a decision cannot be "without support" or "arbitrary." *McQuillion*, 306 F.3d at 904 (*citing Superintendent v. Hill*, 472 U.S. 445, 457 (1985)); *Biggs*, 334 F.3d at 915. The evidence relied upon must have some indicia of reliability. *Id*. The standard is "minimally stringent," and a decision must be upheld if there is any evidence in the record that could support the conclusion reached. *Powell v. Gomez*, 33 F.3d at 40 (*citing Cato v. Rushen*, 824 F.2d 703, 705 (9th Cir. 1987)); *Toussaint v. McCarthy*, 801 F.2d 1080, 1105 (9th Cir. 1986). Examination of the entire record is not required. *Id*. The Supreme Court has specifically directed reviewing courts not to assess the credibility of witnesses or re-weigh the evidence. *Hill*, 472 U.S. at 455. The only relevant question is whether there is *any* reliable evidence in the record that could support the decision reached. *See Id*.; *Toussaint*, 801 F.2d at 1105.

Petitioner has set forth several factors and circumstances favoring his suitability for parole. This court is precluded by the some evidence standard of review from comparing and

contrasting the evidence in favor of parole suitability and the evidence disfavoring parole suitability in order to decide this case. *See Hill*, 472 U.S. at 455. The task at hand is limited to determining whether there is at least one piece of reliable evidence to support the state court's decision upholding the Governor's reversal.

        C.    California Law on Parole Suitability Determinations

In evaluating whether the Governor's reversal was supported by some evidence, the analysis "is framed by the statutes and regulations governing parole suitability determinations in the relevant state." *Irons*, 505 F.3d at 851. This court "must look to California law to determine the findings that are necessary to deem [a petitioner] unsuitable for parole, and then must review the record to determine whether the state court decision holding that these findings were supported by 'some evidence' [ ] constituted an unreasonable application of the 'some evidence' principle." *Id*. This court is bound by California's construction of its own laws in this regard. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

Title 15, Section 2402 of the California Code of Regulations sets forth factors to be considered by the Board regarding parole suitability findings for convicted murderers whose offense was committed on or after November 8, 1978. The regulation is designed to guide the Board's assessment of whether the inmate poses "an unreasonable risk of danger to society if released from prison," and thus whether he or she is suitable for parole. *In re Lawrence*, 44 Cal.4th 1181, 1214, 1202 (2008). The Board is directed to consider all relevant, reliable information available regarding

> the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.

Cal. Code Regs. tit. 15, § 2402(b). The regulation also lists various circumstances that may tend

to show suitability or unsuitability for parole.  Cal. Code Regs. tit. 15, § 2402 (c) and (d).

Circumstances that may tend to show unsuitability for release are as follows: (1) the offense was committed in an especially heinous, atrocious, or cruel manner; (2) previous record of violence; (3) unstable social history; (4) the crime was a sadistic sexual offense; (5) lengthy history of severe mental problems related to the offense; and (6) serious misconduct in prison.  Cal. Code Regs. tit. 15, §2402(c).  Circumstances that may tend to show suitability for parole are set forth as follows: (1) no juvenile record; (2) stable social history; (3) signs of remorse; (4) significant stress as a motivation for the crime; (5) battered woman syndrome; (6) lack of criminal history; (7) age; (8) understanding and plans for future; (9) positive institutional behavior.  Cal. Code Regs. tit. 15, §2402(d).

Under California law, the Governor considers the same factors as the Board in determining whether to affirm or reverse the Board's parole decision.  *In re Rosenkrantz*, 29 Cal.4th 616, 660 (2002).  Although the Governor must consider the same factors as the parole board, he may weigh those factors differently than did the Board.  Cal. Code Regs., tit. 15, §2402 (c) & (d).  He has the discretion to be "more stringent or cautious" in determining whether a defendant poses an unreasonable risk to public safety.  *Rosenkrantz*, 29 Cal.4th at 686.

The overriding concern in determining parole suitability is public safety and the focus is on the inmate's *current* dangerousness.  *In re Lawrence*, 44 Cal. 4th at 1205.  Thus, "the proper articulation of the standard of review is not whether some evidence supports the *reasons* the Governor cites for denying parole, but whether some evidence indicates that a parolee's release *unreasonably endangers public safety*.  *See In re Lawrence*, 44 Cal.4th at 1254.  The parole suitability factors "are designed to guide an assessment of the inmate's threat to society, if released, and hence could not logically relate to anything but the threat currently posed by the inmate."  *In re Lawrence*, 44 Cal.4th at 1206.

        D.      Individual Factors Relied upon by the Governor

According to the Governor's written decision, his reversal of the Board's decision

was based on (1) the circumstances of petitioner's commitment offense and the fact that he subsequently gave different statements regarding the events and his motives; and (2) a finding that his parole plans were inadequate. (Exhibit D.) The Governor also noted that he disagreed with the Board's characterization of petitioner's criminal history as insignificant, but did not expressly rely on this factor in reversing the grant. (*Id*.) The Governor summarized:

> The Los Angeles County District Attorney's Office opposes parole based on Mr. Velasquez's inconsistent statements regarding the murder and the vicious and brutal nature of the crime itself. I agree with the District Attorney's position regarding the murder and Mr. Velasquez's various versions of the crime. Additionally, I find his parole plans to be sorely inadequate. Based on these reasons, I cannot release Mr. Velasquez into society. I believe that doing so would constitute an unreasonable risk to the public's health and safety.

(*Id*.)

         1.     Commitment Offense and Petitioner's Subsequent Statements

Circumstances regarding petitioner's commitment offense and his various explanations of what happened appeared to constitute the Governor's main reason for reversing petitioner's grant of parole. The Governor wrote:

> On November 13, 1981, 35-year old David Velasquez stabbed and killed 29-year old Pamela Martinelli in West Los Angeles. The record indicated that Mr. Velasquez, Ms. Martinelli, and several other people were at the residence of Linda Benjamin. Ms. Martinelli left the home when Mr. Velasquez's friend, Allen Ochoa, stopped Ms. Martinelli outside and began striking her with his fists. Mr. Velasquez then approached Mr. Martinelli with an ice pick and stabbed her 16 times. In an effort to make the crime look gang-related, Mr. Velasquez slashed Ms. Martinelli's throat three times with a knife. Mr. Velasquez and a friend then drove to Culver City and dumped Ms. Martinelli's body in a trash bin where it was discovered the next day.
>
> When Ms. Martinelli was found in the trash bin, her body was partially clothed and concealed under plastic trash bags. The cause of her death was multiple stab wounds to the chest. Mr. Velasquez and Mr. Ochoa were arrested a month later. Mr. Velasquez was found guilty of second-degree murder by a jury and sentenced to 15 years to life in prison.
>
> I note that over the years, Mr. Velasquez's version of the events

that transpired on November 13, 1981, has changed. When he was initially arrested, he had different explanations for the crime: Mr. Velasquez stabbed Ms. Martinelli three times and then someone else stabbed her the other 13 times and slashed her throat, drugs and Agent Orange were really responsible for the crime, and a mentally disturbed person residing in Camarillo committed the murder. He now admits that he alone stabbed Ms. Martinelli and slashed her throat.

Mr. Velasquez's motive for committing the murder has also changed throughout the years. The 1982 probation report indicates that Mr. Velasquez claimed that Ms. Benjamin and Mr. Velasquez's extramarital girlfriend, Claudia Taylor, began beating up Ms. Martinelli because they believed she was involved or attempting to become involved with Mr. Velaszuez and Ms. Benjamin's husband. Mr. Velasquez pointed a finger at Ms. Martinelli who then bit him. Mr. Velasquez became angry and stabbed her three times.

During his psychiatric evaluation in 1985, Mr. Velasquez stated that Ms. Martinelli spoke to him in an intimidating manner. Ms. Taylor asked, "you're not going to take that, are you?" Mr. Velasquez stated that he grabbed the ice pick and stabbed Ms. Martinelli three or four times, but did not murder her.

During his 1991 psychiatric evaluation, Mr. Velasquez stated that he and some friends had gone out to purchase some drugs. When he returned to Ms. Benjamin's home, Ms. Martinelli placed her hand on Mr. Velasquez's shoulder and pleaded with him to get more drugs. Ms. Taylor saw this, became upset, and along with Ms. Benjamin, began fighting with Ms. Martinelli. Mr. Velasquez pushed Ms. Martinelli after Ms. Martinelli kicked Ms. Taylor in the stomach. Ms. Martinelli then bit Mr. Velasquez's finger and would not let go until someone hit Ms. Martinelli. Ms. Taylor pleaded with Mr. Velasquez to kill Ms. Martinelli, but he wanted to leave her alone. He went out to his truck and found Ms. Martinelli. When he told her to get out of the truck, she cursed at him and swung her shoes at him. Mr. Velasquez claimed that he picked up an ice pick to scare her, but when she kept hitting him with her shoes, he stabbed her.

During a 1995 psychological evaluation, Mr. Velasquez stated that the murder occurred because he was intoxicated and high on drugs.

During his 2001 psychological evaluation, Mr. Velasquez stated that a "girlfriend" made a statement that implied she would tell Mr. Velasquez's wife about the affair. It is unclear if the "girlfriend" to which he was referring to was Ms. Martinelli. He states that he was intoxicated and "wound up, stressed out." He stated that he could have just walked away, but did not.

During his 2003 psychological evaluation, Mr. Velasquez reiterated a former version of his story. Ms. Taylor told Mr. Velasquez that he should do something about Ms. Martinelli; Ms. Martinelli hit him with a shoe, and then Mr. Velasquez panicked and killed Ms. Martinelli.

During his most recent parole hearing, Mr. Velasquez stated that Ms. Martinelli bit him, and Ms. Taylor told him to get rid of Ms. Martinelli. When he went to his truck and found Ms. Martinelli inside, Mr. Velasquez stated that the victim asked him if his wife knew that he was cheating on her. At this point, Mr. Velasquez stated that he "went off," grabbed the ice pick and stabbed Ms. Martinelli. Two friends helped him dump Ms. Martinelli's body in a trash dumpster.

I find Mr. Velasquez's various accounts of the murder troubling. He claims that he was intoxicated and cannot exactly recall what happened the night of the crime. My concern, however, is not with his ability or inability to recall the events that transpired the night of the murder, but the various versions of events that he has presented throughout the years. I believe that Mr. Velasquez, as with all individuals who commit crimes, must come to terms with the true nature of his crime if he is to accept responsibility for what he has done. Given his various versions of the crime, I question whether he has accomplished this very important task at this time.

Moreover, I find all of Mr. Velasquez's claimed reasons for committing the crime to be trivial when compared to the heinous and brutal nature of Ms. Martinelli's murder. His most recent explanation- that Ms. Martinelli might have told his wife about his affair- does not mitigate his actions. Although the Board found that this reason was a basis for significant stress when he committed the murder, Mr. Velasquez himself has stated that the victim did not even know his wife. Additionally, there is no evidence that Ms. Martinelli ever stated that she would tell his wife about the affair.

Even if Mr. Velasquez was concerned that Ms. Martinelli would tell his wife about his affair and simply panicked, that reason does not explain why his attack was so vicious. Mr. Velasquez stabbed Ms. Martinelli 16 times with an ice pick. He callously disregarded Ms. Martinelli's suffering as he stabbed her over and over. He then decided to mutilate her body by slashing her throat with a knife so that others would think the murder was gang related. Once he was done killing her, he further desecrated her body by pulling down her clothes in what appears to be an attempt to make it look like she was sexually abused and then disposing her body by dumping it in a trash bin. I find this complete disregard of human life appalling.

(Exhibit D at 1-3.)

1   Although the focus under California law is the current dangerousness of the
2   inmate, the gravity of the commitment offense alone can be a sufficient basis for denying parole
3   where the facts are especially heinous or particularly egregious.  *In re Rosenkrantz*, 29 Cal.4th
4   616, 682 (2002); s*ee also Biggs v. Terhune*, 334 F.3d 910, 913-16 (9th Cir. 2003); *Sass v. Cal.*
5   *Bd. of Prison Terms*, 461 F.3d 1123, 1126 (9th Cir. 2006); *Irons v. Carey*, 505 F.3d 846, 852-53
6   (9th Cir. 2007).[3]  There must, however, be some rational nexus between the facts of the
7   commitment offense relied upon and the ultimate conclusion that the prisoner continues to be a
8   threat to public safety.  *In re Lawrence*, 44 Cal.4th at 1214, 1227 ("the aggravated nature of the
9   crime does not in and of itself provide some evidence of *current* dangerousness to the public
10  unless the record also establishes that something in the prisoner's pre- or post-incarceration
11  history, or [ ] current demeanor and mental state, indicates that the implications regarding the
12  prisoner's dangerousness that derive from his or her commission of the commitment offense
13  remain probative to the statutory determination of a continuing threat to public safety.")
14  (emphasis in original).  The relevant inquiry is an individualized one: "whether the circumstances
15  of the commitment offense, when considered in light of other facts in the record, are such that
16  they continue to be predictive of current dangerousness many years after commission of the
17  offense."  *In re Lawrence*, 44 Cal.4th at 1221.  The passage of time and attendant changes in the
18  inmate's psychological or mental attitude are relevant considerations.  *Id*.

19  One factor cited by the Governor in this regard, though not expressly relied upon,
20  was petitioner's callous disregard for human suffering.  *See* Cal. Code Regs. tit. 15 §2402
21  (c)(1)(D).  There is no doubt that petitioner's actions showed callous disregard to the pain and

---

[3] In another case, *Hayward v. Marshall* (512 F.3d 536, 546-47 (9th Cir. 2008), a panel of the Ninth Circuit determined that under the "unusual circumstances" of that case, the unchanging factor of the gravity of the petitioner's commitment offense did not, by itself, constitute some evidence supporting the governor's decision to reverse a parole grant on the basis that the petitioner would pose a continuing danger to society.  However, on May 16, 2008, the Court of Appeals vacated the decision in order to rehear it en banc.  *Hayward v. Marshall*, 527 F.3d 797 (9th Cir. 2008).  Therefore, the panel decision in *Hayward* is no longer citable precedent.

11

suffering the victim must have experienced during the attack.  The relevant question, however, is whether there are additional circumstances in petitioner's history, either before or during incarceration, which indicate that his callousness during the offense is still probative to the statutory determination of his current dangerousness.  *See In re Lawrence*, 44 Cal.4th at 1227.  The Governor failed to articulate any nexus between the callous disregard of human suffering petitioner displayed on November 13, 1981 and his present risk of danger to the public if released.

The Governor also found that petitioner's claimed reasons for committing the murder were trivial.  *See* Cal. Code Regs. tit. 15 §2402 (c)(1)(E)).  A finding of "triviality" sufficient to justify the denial of parole must also relate to present dangerousness.  *In re Scott*, 119 Cal. App.4th 871, 893 (2004).  Moreover, in order to fit the regulatory description, the prisoner's motive must be more trivial than those which conventionally drive people to commit the offense in question.  *See Id*. (reasoning that all motives for murder could reasonably be deemed "trivial").  Although all of the various motives or triggers that petitioner has described as leading up to the murder would be trivial reasons to kill a person, it does not appear that they are more trivial than those which conventionally drive people to commit second degree murder.  Importantly, at his parole hearing, petitioner expressed that he was aware that his reasons for committing the crime were trivial. (Exhibit B at 14.)  There is no indication that the triviality of petitioner's motive to commit the offense continues to be predictive of his current dangerousness after this many years.

The Governor's main concern with petitioner's offense was its especially vicious and brutal nature.  It is evident that petitioner's crime was heinous.  But when considered in light of the full record, the nature of the offense by itself does not rationally support the ultimate conclusion that he *continues* to pose an unreasonable risk to public safety.  *In re Lawrence*, 44 Cal.4th at 1211-12 (there must be a rational nexus between the facts relied upon by the Governor and the ultimate conclusion of current dangerousness).

The Governor found that petitioner has given various accounts of the murder through the years, and "questioned whether [petitioner] has accomplished the very important task" of coming to terms with the true nature of his crime and accepting responsibility for what he did. (Exhibit D at 2.) An inmate's "mental state" and "past and present attitude toward the crime" are proper considerations for a parole determination. 15 Cal. Code Regs. §2402(b); *C.f.* §2402(d)(3). The Governor may properly reverse a grant of parole "when evidence in the record supports the conclusion that the circumstances of the crime continue to be predictive of current dangerousness despite an inmate's discipline-free record during incarceration [in cases where] the record also contains evidence demonstrating that the inmate lacks insight into his or her commitment offense..." *In re Lawrence*, 44 Cal. 4th at 1228.[4] In this case, it appears that the Governor found such evidence of lack of insight in petitioner's "inconsistent statements." (Exhibit D at 4.)

Petitioner claims to have little memory of the events surrounding his offense. He was intoxicated on a combination of pills and alcohol, and had smoked PCP earlier that day. (Exhibit B at 11-12.) Nevertheless, he thinks the killing was immediately prompted by fear, on his part, that the victim was going to tell his wife that he was having an extramarital affair with another woman. (Exhibit B at 14-19.) Petitioner and the victim had also argued over drugs, which petitioner refused to either give or sell her. (*Id*.) Petitioner recalls pointing his finger at the victim, and the victim biting his finger. (*Id*.) At some point petitioner's co-defendant struck the victim. (*Id*.) The situation obviously got out of hand, culminating in the brutal murder.

As the Governor detailed, upon petitioner's initial arrest and during his 1985 and 1991 psychiatric evaluations, he gave differing versions of events leading up to the offense which minimized his responsibility. For example, petitioner maintained until at least 1985 that he had

---

[4] Consideration of whether an inmate lacks insight into or accepts responsibility for the commitment offense does not conflict with the statutory requirement of section 5011(b) that the Board "shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed." *See In re Elkins*, 144 Cal.App.4th 475, 493-94 (2006).

only stabbed the victim three or four times. (Exhibit D at 1-2.) In 1991, he implied that he did not want or intend to kill the victim but that he did so on the encouragement of his girlfriend. (Exhibit D at 2.) Since 1995, however, there is no evidence that he has downplayed his offense or minimized his responsibility in any way, other than to maintain that drugs and alcohol played a role.

      Considering petitioner's inability to recall the exact events leading up to the murder, the various statements he has given at parole hearings and psychological evaluations through the years do not constitute evidence that tends to show that he remains currently dangerous. As they are set forth in the Governor's written decision, petitioner's statements about his offense are admittedly different. (Exhibit D at 2.) Since 1995, however, they are not necessarily contradictory. Petitioner had been in the presence of the victim since "earlier in the day" (Exhibit B at 16) and various events took place leading up to the commission of the crime. Petitioner stated that "[t]here was a lot of commotion going on" (Exhibit B at 12) and he has no clear memory of exactly what occurred. (Exhibit B at 11, 43-44.) As noted by the presiding commissioner at the parole board hearing, the various events petitioner has described at different hearings and assessments may have all transpired over a long one day period. (Exhibit B at 64.)

      To complicate matters, the context of each of petitioner's reported statements is not clear from the Governor's written decision summarizing them. Some or all of the reported statements may detail only a part of his entire statement or description of the crime on each occasion. For example, in describing petitioner's statement at his most recent parole hearing, the Governor did not note that petitioner mentioned anything about his argument with the victim over drugs, as previously described at his 1991 psychiatric evaluation. But petitioner did describe those same events at his most recent parole hearing, stating that the argument over drugs occurred earlier in the day.[5] The point here is that petitioner's various statements may not be as

---

[5] Petitioner stated that the victim asked him for some pills and he refused. The victim put her arm around petitioner, which caused his girlfriend to get the "wrong idea about what was

14

different as they appear in the manner set forth in the Governor's written decision.

    Since 1995, there is no evidence that petitioner has minimized his role in his life offense or given contradictory explanations. Of course, his descriptions of the events leading up to the murder have never been completely clear. To a certain extent, he has never been able to provide a clear explanation of exactly what prompted him to viciously murder the victim. Yet he has always maintained that he has no clear memory of what happened. The Governor wrote that his concern was "not with [petitioner's] ability or inability to recall the events that transpired the night of the murder, but the various versions of events he has presented throughout the years." But petitioner's various statements since 1995 are not contradictory, and the Governor did not point to any rational evidence that petitioner's inconsistent statements made prior to 1995 continue to be predictive of his current dangerousness.

    Upon the record before the Board and Governor, the present case is not one which supports a determination that, despite petitioner's expression of remorse, he has "failed to gain insight or understanding into... his commission of the commitment offense." (*Shaputis*, 44 Cal.4th at 1260.) A significant period of time passed between the offense and the parole hearing at issue here. It is undisputed that petitioner showed remorse and fully acknowledged sole responsibility for killing the victim at his 2003 parole hearing, as well as for a significant time prior. (Exhibit B at 14 & 43 & 45.) Since commission of his life crime, petitioner has committed no other violent offense, nor any infraction of prison rules that might suggest any lingering inability to conform his behavior to the requirements of society. Instead, there is uncontroverted evidence of his rehabilitative efforts while incarcerated.

    As the Board noted, while in prison petitioner participated in educational

---

happening." (Exhibit B at 16-17.) Later on that night, petitioner was pointing his finger at the victim, telling her to leave, when the victim bit his finger. Allen Ochoa hit the victim. (Exhibit B at 13 & 17-18.) After looking for something to clean his finger with in the bathroom, petitioner went out to his truck and found the victim inside. (Exhibit B at 18-20.) The victim asked him if his wife knew he was cheating on her, and that is when petitioner "went off" and killed her with the ice pick. (Exhibit B at 20.)

15

programming, and completed his GED in 1985. (Exhibit B at 55.) He has participated in several self-help and therapy programs, including AA and NA on a continuous basis, a Human Development Seminar, Breaking Barriers, and a Victim Awareness Program, among others. (Exhibit B at 56.) He completed two vocational programs and has received positive reports from his job assignments. (Exhibit B at 56.) Petitioner's classification score is zero. (Exhibit B at 62.) He has been discipline free for over 20 years, having received only one minor disciplinary infraction during his entire prison term, for failure to make count on his second day of a new job. (Exhibit B at 63.)

In the most recent psychological evaluation available to the Board, Dr Rouse stated:

> Mr. Velasquez, for the most part, has made the most appropriate, personal, social, and behavioral adjustments in this institutional setting, and there is a high probability that he could continue to do this outside of prison. Seemingly, Mr. Velasquez has matured and has gained a great deal of insight and understanding of the life crime. As such I would assess that his risk of dangerousness is lower than that of the average inmate incarcerated here at CSP Solano.

(Exhibit B at Decision Page 4.) The previous psychological evaluation dated 2-7-01 by Dr. Taylor was also supportive, indicating:

> Mr Velasquez appears to be quite industrious, (inaudible) a landscaping business outside of prison and while in prison. No disciplinary reports were noted in the file and he has received positive work reports. There were no particular impulse, mood, attitude, or emotional displays suggesting a risk of violence. He expressed no interest in violence or hostility for others. He has participated actively in AA and NA, (inaudible) of the benefits of a drug free existence. He appears relatively connected to at least some family members and to some friends outside of prison. He carries a diagnosis of an Antisocial Personality Disorder but currently evidences few symptoms of this and age and maturity have seen the decreased aspects of this personality style.

(Exhibit B at Decision Page 5.) Other psychologists in 1999 and 1998 indicated that petitioner was "not violence prone" and that his potential for violence in the outside community was

16

"almost zero." (Exhibit B at 39.)

Petitioner's accomplishments and positive psychological assessments are not recited here in order to be balanced or weighed; indeed, such treatment is precluded by the some evidence standard of review. But the role of the Governor was to conduct an individualized suitability determination focusing on the public safety risk petitioner *currently* poses. *Id*. at 1217, 1221. The circumstances of the murder were not such that they continue to be predictive of his current dangerousness this many years after commission of the offense, given the uncontested facts in the record demonstrating significant rehabilitation, changes in his psychological and mental attitude, and exemplary behavior in prison. *See In re Lawrence*, 44 Cal.4th at 1217, 1221; *In re Elkins*, 144 Cal. App. 4th 475, 498-99 (2006) ("[T]he commitment offense . . . is an unsuitability factor that is immutable and whose predictive value 'may be very questionable after a long period of time.' . . . Reliance on an immutable factor, without regard to or consideration of subsequent circumstances, may be unfair, run contrary to the rehabilitative goals espoused by the prison system, and result in a due process violation.") (internal citations omitted). Moreover, the Governor's conclusion that petitioner remains currently dangerous because he has not come to terms with the true nature of his offense is not supported by some evidence. There is no rational nexus between the facts of petitioner's commitment offense, brutal and vicious as it was, and the ultimate conclusion that he continues to be a threat to public safety. It therefore appears that the Governor's findings concerning factors related to the commitment offense are not supported by some evidence in the record.

2. Inadequate Parole Plans

In addition to petitioner's differing statements regarding the murder and the vicious and brutal nature of the crime itself, the Governor relied on his finding that petitioner's parole plans were "sorely inadequate" in reversing the Board's grant of parole. The Governor wrote:

/////

> Mr. Velasquez had been married for over thirty years and maintains strong ties to his wife. If paroled, he has indicated that he would live with his wife in Calaveras County. Mr. Velasquez's wife has stated that she has a vehicle that her husband could use. She further stated that she has many connections through her job and is confident that she could find Mr. Velasquez a job. If her husband cannot find a job, they will resume his landscaping business.
>
> I am concerned about Mr. Velasquz's lack of parole plans. Not only has he not secured employment, it does not appear that he has even attempted to locate a job. I am also concerned that the Board did not fully discuss Mr. Velasquez's parole plans with him. At one point during his most recent parole hearing, Mr. Velasquez's attorney asked him if he believed he would have any problem securing employment as a landscaper upon his release to which Mr. Velasquez replied, "no." His attorney then asked if his skills are still sufficient in that area, and Mr. Velasquez replied, "yes." I cannot rely on Mr. Velasquez's one word responses as assurance that he will have a job if he is released from prison. It has been over 20 years since Mr. Velasquez has done any landscaping work, and while he has gained vocational skills in other areas since his incarceration, he does not have any job offers at this time. I am concerned that without a job to keep him busy and financially secure, Mr. Velasquez may revert to his former ways of drinking and doing drugs. Such behavior increases the likelihood that he will become involved in criminal activity.

(Exhibit D at 4.)

A prisoner's understanding and plans for the future, specifically where the prisoner "has made realistic plans for release or has developed marketable skills that can be put to use upon release," is a factor tending to indicate suitability for parole. *See* Cal. Code Regs. §2402(d)(8). There is no requirement that a job offer be obtained or that a prisoner demonstrate attempts to secure a formal job offer. *See Id*.

The Governor stated he was concerned that petitioner did not demonstrate his attempts to locate a job, and was also concerned that petitioner gave only one word answers in response to questions asking whether he believed he would be able to secure employment as a landscaper upon release. The Governor's concerns in this regard do not constitute some evidence that petitioner lacks understanding and plans for the future. It would be surprising if petitioner had been able to secure a firm offer of employment given the fact that he is incarcerated, has no

release date, and has no certainty of *ever* being released.  Petitioner has a place to live at his wife's home in Valley Springs.  (Exhibit B at 26.)  He has successfully completed vocational programs while incarcerated, including upholstery certification and eyewear manufacturing, and received positive reports from his various work assignments.  (*Id*. at 30.)  Petitioner's wife indicated that she knew people willing to employ him and that she would help him find a job.  (*Id*. at 27)  As an alternative, they could resume their former landscaping business that was in operation at the time of the offense.  (*Id*.)

The lack of a formal job offer does not, by itself, mean that petitioner's plans for release are inadequate.[6]  *See, e.g.*, *In re Criscione*, 173 Cal.App.4th 60, 75-76 (6th Dist. 2009) (inmate's plans for release were realistic, as would support a grant of parole, even though he had no job offer, where he had completed two vocational courses, had offers of housing and assistance, believed he could find part-time work in the bakery field, and had demonstrated that he would not be destitute upon release); *c.f. In re Honesto*, 130 Cal.App.4th 81, 97 (6th Dist. 2005) (inmate's plans for release were not realistic where he had no job offer, no offers of housing or support if released, and had failed to engage in adequate reformatory efforts while incarcerated).

In any event, as repeatedly emphasized herein, there must be some rational nexus between the fact found and the conclusion that petitioner would pose a danger to society if released.  The record contains no reliable evidence that petitioner currently poses a threat of danger to society, if released from prison, based on his parole plans which do not include a firm job offer.  The Governor's findings concerning petitioner's plans for the future are not supported by some evidence in the record.

/////

---

[6] The parole suitability factor (notably, not an *unsuitability* factor) at issue is whether "[t]he prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release." Cal. Code Regs. tit. 15, §2402 (d)(8).  There is no evidence that petitioner failed to meet this criteria.

V.  CONCLUSION

The evidence purportedly relied upon by the Governor in reversing the Board's decision granting petitioner parole is without any indicia of reliability. The Governor's reversal is not supported by some evidence in the record. It therefore appears that the state court's decision upholding the reversal was unreasonable and constituted a violation of petitioners' due process rights.

For the foregoing reasons, IT IS HEREBY RECOMMENDED that

(1) Petitioner's application for writ of habeas corpus be GRANTED; and

(2) Respondent be directed to release petitioner from custody, within 10 days after any order adopting these findings and recommendations, in accordance with the September 23, 2003 decision of the Board of Prison Terms finding petitioner suitable for parole.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED: July 7, 2009.

/s/ Charlene H. Sorrentino
Charlene H. Sorrentino
United States Magistrate Judge